Attorney General, State of Florida, v. SNAP. Mr. Hildebrand here for the appellants, Ms. Wellington here for the appellees. Mr. Hildebrand, you have reserved three minutes. Yes, Your Honor. Very well. May it please the Court, Clark Hildebrand for Appointment of Appellant for the Department of Legal Affairs. I'll focus on the jurisdictional issues, but of course I'm glad to discuss the First Amendment and Preliminary Injunction merits issues, and the Court has spent plenty of time this morning on the First Amendment, so I'll focus on those jurisdictional issues here. First, this Court has jurisdiction to decide whether the District Court had subject matter jurisdiction over the case. First of all, this Court undoubtedly has appellate jurisdiction under Section 1292 due to the And after that, this Court can reach the subject matter jurisdiction either through its independent obligation to do so, as in cases such as McGinnity, which is a very similar pattern there, or this Court could do so under its penitent appellate jurisdiction. There are cases such as Schultz v. Alabama, 42 F. 4th 1298 from 2022 from this Court, where this Court has done so, where the issue of subject matter jurisdiction is intertwined with the decision to grant or deny a preliminary injunction. Second, this Court should also instruct the District Court to remand the case to Florida State Court, because that's where the case belongs. The federal courts do not have subject matter jurisdiction over this case. Under Section 1442, SNAP is not acting under a federal officer. They are simply providing advertisements to DHS and to the FDA. There's not the unusually close relationship, and SNAP's approach to this would essentially turn virtually every contractor into, essentially, a federal officer and have those all remanded – have those all removed to federal court. Second, in addition to the acting under problem that SNAP has, the federal advertisements are not the basis of Florida's complaint against SNAP. Let me ask you about the acting under prong of the removal test, of the federal officer removal test. So, in Kaver, we said that the duty or task had to be, quote, a basic government task that the government otherwise would have had to perform. What did we mean by that? So, I think for Kaver, for example, where there was the rule of electrification, there was the longstanding relationship, and that had to be carried out with the loans that are provided under very close federal regulations on what the loans were there. Here, however, there's no requirement that SNAP uses – But, before we distinguish it there, what do we mean? You correctly stated what some of the facts of Kaver are, but what did we mean by that as a principle of law? So, I think, as a principle of law, it's really that what the private entity is doing there is really following what the federal officer is telling them to do and that they would have to do otherwise. Here – Does it mean that the government would have had to have, meaning must have, performed that task in the absence of the third party doing it? In other words, is there a command that the government entity do that task that, but for the third party relationship, the government would have to do itself under federal law? Is that what it's saying? I think so, Your Honor. So, like in Kaver, for example, there was essentially a statute which says, we are going to provide rural electrification. Figure out how to go do it. And the alphabet soup of agencies that are tasked with that decided, here's how we're going to do it. We have a loan agreement, and we'll have third parties provide that and sort of back up the loans and tell them exactly what we want to do and have to do it, right? I think for Kaver, you have a very specific – these are all the ways that we're going to write a loan. This is how we're going to do this. We're going to carry this out. You know, set up all sorts of different loan structures, you know, TVA, all sorts of ways to achieve this rural electrification. The statute – Yeah, sorry. So, getting to here. So, the statutes that both of you guys cite that the district court relied on here about the FDA and DHS, do they require that there be a social media campaign for those between the ages of 13 and 17 for human trafficking and cigarette smoke? I don't think that they require these specific campaigns to be conducted for 13 to 17-year-olds. They certainly don't require to be done with the addictive features that SNAP is using. Well, we'll get to the addictive features part. But I guess my question is, using the standard from Kaver, is this a basic government task that the government would have to, must have performed itself without doing this? In other words, would the government have to start its own social media site and provide these things in order to do that? Because by law, whether regulation or statute, it required that to be done? Or was it just go have an information campaign and then some functionary decided this is the way we are going to implement that? I think it's more that it's have a campaign and then someone decide this is how we're going to go out and do this here. It's not, there's no requirement for the government to set up a social media platform to go out and provide these advertisements to 13, 14, 15-year-olds. Here this is just simply how it's being carried out because SNAP, with its addictive features, has a lot of 13 to 17-year-olds who are on there. But there's no requirement that these advertisements be given on a social media platform. There'd be other ways to do that. You could have billboard advertisements, other things like that out there. And there's certainly no requirement that you go out and use addictive features or an algorithm targeting these specific ages to do that. So that goes to show that this is not something that the federal government would really have to do. I think SNAP has argued that the federal government would have to go out and set up its own social media platform to do these sorts of things. And it certainly wouldn't have to do it with these addictive features. Kaver also seems to suggest under the acting underprong that one must be subjected, guided, or controlled. It's subjection, guidance, or control. And let's assume it's an or test, not an and test, that control isn't there. What is the thing in Kaver or elsewhere from the Supreme Court in Watson that has to be subjected, guided, or controlled? I think it really comes to sort of an agency relationship as we've argued in our briefs there that it's really that they're essentially acting as an agent of the federal government there and carrying it out. Well, I'm not sure that I agree on the agency thing, or at least that the law has caught up to where you think it should be on that. But I guess my question is more fundamental than that. What is the thing that has to be subjected, guided, or controlled by the federal government in carrying out the task? Is it the thing with which it was hired for? So let's assume for the moment that I hired a swing line to build me red staplers. What has to be subjected, guided, and controlled in my contract with a swing line in order for their red staplers? I think you have to have very specific, very specific, close supervision there. It's more than just the normal, looking at Watson, it's more than just the normal contractual relationship there. And I think look at the Ninth Circuit case in Kovalche, for example, with the fireworks example, where the federal government had an agreement with a third party entity that it would store these fireworks seized by the federal government and then dispose of them. Now that was kind of the high level what to do, but the federal government was not closely supervising what they were doing here. Similarly, you have the federal government saying, here are these advertisements to place on here. But it's not controlling that SNAP has to use these addictive features, that SNAP has to use these algorithms targeting 13 to 17 year olds. Is that the difference? In other words, it's not telling, it's not telling the SNAP, here is how you use your algorithm in order to do these five things in order to do that. And it must be to this particular age group at this particular time, in this particular place, at this particular moment, with these particular posts associated with it. Is that the kind of guidance, subjection, and control that would require an arising under? Acting under? I think here to get to the subjection, the federal government has to be saying, you need to use these addictive features, you need to use these algorithms to target them. You cannot in any way prohibit there being 13 year olds on the platform. You cannot require for the 14, 15 year olds that they have parental consent to be on there. Those just really are things that the federal government has not concerned itself with at all. It simply has these advertisements and SNAP is still using its discretion on how it's putting those out there and it's using those algorithms, those addictive features to do so. The federal government is not requiring SNAP to use those addictive features. If tomorrow, SNAP decided to stop using those addictive features, the federal government is not going to turn around and say, this is violating the agreement that we had reached. And first of all, with the DHS, you know, Rand, I understand there's not even any legal obligation that's imposed. There's no authority that's been passed along. And then for the FDA, it's simply just a form contract that they would have with any other service provider. But the federal government cannot prevent SNAP from stopping to use those addictive features, which goes to show this is not a function of the federal government that would have to be done anyway. The federal government is not going to then turn around and say, I'm going to set up its own social media platform to provide these to 13, 15 year olds. So just so I'm clear, are you, are you saying that the third party, the private party has to be, in effect, a puppet? I mean, is there, is there, is there no sort of middle ground between complete micromanagement at the one end of the spectrum and, you know, sort of like customer service at the other end of the spectrum? I think they need to really be the agent under a strong degree of control by the federal government there. It's not simply just a contractor. That sort of relationship is not enough in and of itself. You don't have to win, though, in order, I know you've taken that position in your brief that it needs to be the equivalent of an agency relationship. You don't need to win, though, in order to take that position, right? Correct, Your Honor. We just think that the agent example is, to us, that's the degree of. So if you would just answer Judge Houston's question, let's take, let's say the law is middle ground. Is this even a middle ground case or is this just a customer service kind of case? I think this is just a customer service case. This is the federal government's putting ads on there, SNAP's writing its feedback. This is where you might want to consider doing with these ads. Anyone can create different lenses or things like that to put on there, but SNAP is not being closely supervised by the federal government in carrying this out. I don't think this is even a middle ground case. This is just a typical customer service, and I think it's kind of surprising this is why you haven't seen SNAP or other social media entities raising this argument in other cases or trying to remove because it's really far out there and there's very little federal involvement that's going on. And then as well for the second part with the relatedness, you know, the federal advertisements are not the basis of Florida's enforcement action. I think look at cases such as state v. Meadows and look at the heart of the complaint. And here, it's not... Part of the complaint here is the use of the addicted features in the course of offering these social media services to minors, right? Correct, yes. So do we have to then look at whether, in fact, what was regulated here or subjected or controlled or guided was the very things for which we are in court for? And here, there's not the... It's not about the addictive. It's just simply putting the advertisements on there. It's not about the addictive features. The federal government's not requiring the use of those addictive features in things like infinite scroll. There's no claim that SNAP's ever made that the federal government's requiring them to use infinite scroll. I see my time's expired. I'll come back for both. Very well. You've got three minutes of rebuttal time remaining, Ms. Wellington. May it please the court, Katie Wellington on behalf of SNAP. And I just want to make clear at the outset, this case is just about SNAP. This is the state of Florida seeking to prosecute SNAP and SNAP defending itself under the First Amendment. So I think we're in a very different context here. So I want to start with the federal officer removal issue, but I want to make sure we have some time to talk about the First Amendment because I think the analysis is different in some respects here. Let me ask you this. Are you... I'm not going to hold you to a concession, but are you sort of skipping over our jurisdiction to decide the district court's jurisdiction? I'm happy to address that if you like. This court has not reached a clear conclusion on that issue. I think if you look at the summit medical case in particular, that's a 1999 case. This court reached the merits of the 11th Amendment immunity question there without reaching the Article III standing question. It said it did not have to reach that subject matter jurisdictional question. Well, that's because we can choose jurisdictional paths to go down where we do that, but that's a separate issue than we have. It seems to me... I've tried to do a survey and it seems to me that every circuit that has addressed this issue head on has said that whether it's under appended appellate jurisdiction or just the concept of we have to address our jurisdiction before getting to the merits has reached the jurisdictional issue. Do you agree with that? So we cited one Third Circuit case from 1950 that we think took a different approach. And you agree the Third Circuit though has, in other cases, gone the other way on that? That is correct. We do have a statutory interpretation argument here, which is Congress thought about this and Congress didn't want to allow interlocutory appeals in this circumstance, and we're talking about statutory, not constitutional jurisdiction. So we have an argument there, but certainly I would like to turn to the federal officer removal issue. So I want to push back on the state's narrative of the facts here because I think the facts here are very important. So if you look at 8-121 of the record, which is the Memorandum of Understanding between DHS and SNAP, DHS has a statutory obligation. It 4-6 U.S.C. 473 B-2F, which says that it shall collaborate with non-governmental entities for the sponsorship of and participation in outreach and training activities. Let me be clear. There's no doubt those statutes exist. You don't even need to point to the contract. Those statutes just exist. There's no doubt that they have to do something. I guess my question, my legal question in reading CAVR, which is our law that we're Does it mean when it says that it has to be essentially something that the government would otherwise have to do, that it is a mandate by statute that the government do the very thing it was contracted for? Or does it just mean that a general authorization allows the government to sort of choose where it's going to go and that's enough? So totally understand the question. Very much believe it's the latter. I don't think there's any case that says Congress has to expressly spell out how DHS expressly goes around and says which non-governmental entity I want to talk to exactly what the content of that press release and outreach is going to be. It certainly doesn't have to be that specific, but doesn't it have to be there must be a social media advertising campaign regarding non-smoking and then contracting in order to do that very thing as opposed to just, hey, you got to reach out to third parties and have a campaign out there. Because there's a million ways DHS or FDA could go on these things. It could do billboards. It could have people go out into schools and talk to children. I mean, there's a million ways to do this other than going through Snapchat. If it has to be a basic government function that the government would otherwise have to do on its own, how is this something that the government would otherwise have to do on its own when it could do 10,000 other things? Well, so the government gets to choose the means. We're talking about really important issues here, basic government functions of informing the public, protecting our children. And of course, DHS gets to decide, you know, do I want to do that through social media or traditional media? That doesn't mean that the federal officer removal statute doesn't apply. This is a broad statute. It's liberally construed. I don't think you can dispute this as a basic governmental task that SNAP is assisting with. How do we read our law? I mean, that's what we're bound. I agree with you that if we were starting from first principles, maybe you'd be right. But CABR seems to suggest, and in CABR, in fact, the statutes and regulations did require the exact thing that the government did. It required rural electrification. It said you do it through these means, through the regulations, and they started to do it. I just, I'm seeing a disconnect between like a choice of a huge range of options versus the government is going to have to do this on its own or it could do it through a third party. So I don't think, you know, I think these statutes are actually pretty detailed. I think they're saying you have to collaborate with non-governmental entities to talk about this specific thing. I don't think it has to say, you know, through social media. Like that piece, I think you can leave up to the government agency and still have them, you know, SNAP here be acting under the federal official. I haven't read any case that suggests that there has to be like down to that level of minutiae. And I think if this court were to adopt that, I think that would very much narrow the federal officer removal statute. I think if you look at, for example, the Plaquemines case that's up at the Supreme Court right now, I don't think there's some sort of statute or exact, you know, contractual requirement that these oil companies went about extracting oil from the ground to create aviation gasoline. I think there was just a general, you know, goal of the government to produce aviation gasoline for World War II. Counsel, Congress required that planes be built. Those planes need gasoline. I mean, there is a direct correlation between the mandate of the law versus what had to be done. If a company didn't do it for the government, the government would itself have to do it to be able to put gasoline in the planes. I just, I don't know that I see that but for relationship here that Kaver seems to set out.  But I don't think the government there said, okay, here's how you have to extract the oil from the ground. And that's what that case was about. Okay. So that gets to the second part, which is the subjection, guidance, and control. Because I think you're right. Here there's an authorization to do something. There's a contract to go do it. But the government isn't telling you how to go, you being Snap, isn't telling Snap how to go about doing its job. In other words, it's saying to Snap, you're really good at getting the kids. We know that. So here I'm hiring you. I'm using my credits to buy ads. Here's the ad. Go to kids. Go give this to kids. So I think that's where I'd push back a little bit on their narrative, the facts. So what the federal government did and said, come to Snap. We want Snap to do research on what kids and teenagers know right now. And we want to use that research to create a custom tool. So this is a custom lens, a custom product that the federal government wanted to create with Snap. Snap and DHS went back and forth over multiple months about what questions we want to put in this product. It was a quiz, a true false quiz. DHS said, these are the questions we want. This is how we want this product to be built. But Council, here's the issue. Snap is not being prosecuted as a content creator. In fact, the whole concept is it's not a content creator. It's users that create the content in Snap and in these other social media sites. By definition, that's what they are. And so the question isn't whether they consulted with Snap about how to make a great ad. The question is, we hired you to disseminate that ad. And it is the dissemination for which they are being prosecuted is the dissemination that is the result of this contract. And it is the dissemination for which I don't see any direction, guidance, or subjection that DHS or FDA has given to Snap in releasing that ad. So two responses to that. The first is that DHS wanted this custom product. And again, this is not just an ad. This is an actual custom product, a lens. And said, we want this to reach teenagers. And the way that Snap reaches teenagers is through its algorithm. So I think there's a clear connection there to the state of Florida saying, we don't want you to use algorithms when you're accessing teenagers. That's the causation piece, but I'm talking about the subjection, guidance, and control piece. Right. Well, I think they're giving us guidance. This is exactly what we want you to create. And here's who we want you to go to. We want you to reach kids through your platform. Right. Oh. That's guidance? That's subjection? That's control?  So months and years, it's a two-year-plus relationship going back and forth every month. And this is the content that we want you to have on your platform. This is the product we want you to create. And here's how we want you to release this to teenagers. I think that is actually far more than the subjection, guidance, and control than you get in cases like CAVER and many of these other federal officer removal statute cases. And I want to point out here, this is just a relating to test. That is the standard that the federal government set forth. And I think the idea that there has to be such a fine level of statutory direction here that the federal government, federal official, can't make a decision about which platform to use, how to reach teenagers. I don't think there's any case law suggestion. The related to gets to the causation piece. It doesn't get to the acting under piece. And the acting under, so it doesn't have that language attached to it, number one. And number two, does require some degree of control. Again, I don't think it, to use Judge Newsom's analogy, I don't think it requires complete agency relationship, but it probably requires something more than just using you as a customer service or as someone to buy something from. I just, I want to know where that middle is, whether we're on one side or the other. Right. Well, we would say that Arlington, the statement in Arlington County, the Fourth Circuit case, that's selling a standardized consumer product to the federal government, we agree that that is enough. But we do not think that is the situation where the federal government is coming to us and saying, we want a custom product. Put this in a different situation. Put it in, say, a military contracting situation. The government is coming, saying, we want a product. Here's the type of product we want. We obviously give you some discretion to figure out exactly how to do it and then deliver it to you. If you've ever seen one of these military contracts, there is little discretion. Down to the size of the screw and what products and what sub-products have to be in there. I think that is the analogy for which clearly is a federal officer and why I think this is not. Because this seems to me just, we're buying staplers and we're not telling you how to make those staplers. So we disagree that this is just not a stapler. This is a key, fundamental government program. Its goal is to reach teenagers and it's doing it in a particular way. I do want to leave some time for the First Amendment, if it makes sense to move there. Can I ask about diversity? Because if we do reach jurisdiction, I think we do have to address that as well. Do you disagree with our law which suggests that, and I think it's well established that where it's a state or an agency of the state or a part of the state, it cannot be diverse citizenship for purposes of diversity? So we cited the Ohio case in the lower court. So again, this wasn't addressed by the district court. We think the best course would be to remand so that we could have full briefing on this. But we do think- How can we do that though where we have to assure ourselves of subject matter jurisdiction? Well, if you think there's a question, I think you can send it back on that. But we did brief this in the district court. We would direct the court to our briefing on that if it's an issue the court's going to reach. We cited the Ohio case where the question is, who is the real party in interest here? We think the real party in interest here is the teenagers. And in that situation, there is a diversity jurisdiction. How could that be true for a prosecution though? I mean, this is essentially a civil prosecution. It's not XREL. It's not on behalf of Joe Smith who was injured by them. The way the statute is set up is any violation results in a fine. I mean, it doesn't even need to be an injury involved. And they haven't even alleged a specific person that's been injured as I read the complaint. Well, I understand this complaint to be seeking penalties on behalf of individual teenagers. So that's our diversity jurisdiction argument. I do want to spend a little bit of time on the First Amendment because I think there's some important points to make there. So we have been sued here in Florida. We are defending against this lawsuit. And so I don't think there's any of the standing questions or anything like that. I do want to make a couple of points that I think are really important to emphasize. The first is the ways in which that this is a content-based law. So I want to direct the court in particular to page 7 of the state's brief where the state explains what it's really concerned about here. And what the state is concerned about here is early adolescence is when identities and self-worth are forming and brain development is especially susceptible to social pressures, peer opinions, and peer comparison. So what the state is really trying to do here is block teenagers from sharing their opinion on these social media platforms and on Snapchat. And that is a content-based distinction. No, just why is that? I mean, presumably sharing their opinions about anything and everything on this social media platform. So why? I just don't think I understand why it's content-based. Right. I think there is a distinct content, which is teenagers talking about their everyday interactions. If you had a law that says we aren't going to allow teenagers to submit op-eds to newspapers because those are opinions by teenagers, I think you would view that as a content-based law. The state of Florida is trying to prevent a specific type of content. And I think you can see this at all stages of the state's complaint. So A145 of the complaint, again, what the state is worried about is teens comparing themselves, their relationship, and their social standing to others. Do you mean by reference to your newspaper analogy that teen speech is a content category? I think teens talking about their everyday lives is a content category, yes. We think that is a unique. I don't think you can go onto Snapchat and get the same content that you're going to get on a traditional news site or a traditional sports site. It is a different type of content, and I think from a practical perspective, you just aren't going to get the same. I mean, if I open up—this would be embarrassing, perhaps—if I open up my Instagram, Judge Luck is a better person than me. I have an Instagram feed. But if I open it up, it's going to show you travel sites, marriage memes, Alabama football, just kind of all over the place, scattershot. Right, well, we're talking about Snapchat here, so we're talking about teenagers posting about what they're doing. I don't think you have that—that is a unique type of content. I do want to just briefly touch here— If that is the intent of the statute, it is clearly overbroad as to that, because if you do refer to it—I mean, the content-based question is either itself, the statute itself makes a content-based distinction, or you are required in application to make a content-based question. And it seems to me that I just don't—even if it was targeted at teen speech, both the text of the statute and its reference to anything doesn't signal out teen speech, right? So we disagree with that. I would just wrap up to say, even if you think it is not content-based, there is a very high bar under intermediate scrutiny in the First Amendment context under cases like McClellan, Florida Preborn, and also under LaCroix, where you're entirely foreclosing an important medium of speech without adequate alternatives. Okay, very well. Thank you so much. All right, Mr. Hildebrand, you've got three minutes left. Justice, real fast, Your Honor. All right, so first, I want to address the high level—the statutes that are involved here, just point back to the text of them. So for DHS, the statute is simply about conducting outreach and training activities about child exploitation. That extremely high level is not the sort of thing that we would see in cases like Kaver, Magnin, or military contracts that are very specific about how they're carried out and some of the federal government have to do, such as with the World War II example, that you have to have the airplane fuel to be able to win World War II there and to provide those planes. And for the FDA, the statute, again, is just for educational and public information campaigns, including tobacco use by minors. That's not something that requires creation of a social media platform, and it doesn't require use of addictive features. That's incredibly high level, and that's why we think this is just a very simple case where that first acting under requirement is not even close to being met here. Second, I'll move to some of the First Amendment issues here. Teen speech is not a content category. I think I'd look at the Supreme Court's decision in cases like City of Austin, for example, where even where you have to know who the speaker is, so there he had billboards and there's an ordinance that made a distinction based on whether the billboard was for on that information. The Supreme Court ruled that it was content neutral. So here, similarly, this would just be, even if it's expressive, which we've reached that issue, don't think it is, but even if like the stay panel, the court thinks that this is triggering the First Amendment, this would just be content neutral. And Florida has put forward unrebutted expert reports in this SNAP action, including from Dr. Twingy talking about how social media uses increased mental health concerns among teenagers, from Professor Alter talking about the addictiveness of features such as infinite scroll, auto play, the other addictive features, and from Dr. Hale showing the impact on teens' sleep patterns through the addictive platforms such as Snapchat. That's information that SNAP has not even tried to rebut here. I think SNAP- Is this being brought on behalf of third parties in Florida? In other words, does the complaint say there's Joe Smith and Jane Doe have been injured by this and we are filing this lawsuit in order to recover for them? The real party interest is the state of Florida, Your Honor. So that's why on diversity jurisdiction, there is no diversity jurisdiction in the federal court. No, I know that's your position, but why is your opposing counsel wrong that this isn't brought on behalf of third parties? Because it's not- Florida is trying to enforce this law to protect a broad swath of parents, of teens, and to achieve those goals. It's not just to recover on behalf of any particular teenager or something like that. And in that sort of circumstance, they're the real party of interest, as this court's precedent in our briefing would show, is the state of Florida. And there's not diversity jurisdiction in federal courts. I see my time has expired, so I encourage the court to vacate with instructions from Anne to stay. Okay, very well. Thank you both. The case is submitted. Third case of the day.